**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0435n.06
Filed: June 21, 2007

No. 06-3555

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

DANIEL LAMER, )
)
    **Plaintiff-Appellant,** )    **ON APPEAL** FROM THE
)    UNITED STATES DISTRICT
v. )    COURT FOR THE NORTHERN
)    DISTRICT OF OHIO
METALDYNE COMPANY LLC, )
)      **O P I N I O N**
    **Defendant-Appellee.** )
_____ )

**Before: KEITH, BATCHELDER, and MOORE, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** Plaintiff-Appellant Daniel Lamer ("Lamer")

sued Defendant-Appellee Metaldyne Company LLC ("Metaldyne") in the United States District

Court for the Northern District of Ohio, alleging retaliation[1] in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); 42 U.S.C. § 1981; and OHIO REV.

CODE ANN. § 4112.02(I) (West 2001); and wrongful discharge in violation of federal and Ohio

public policy. The district court granted summary judgment in favor of Metaldyne on all of Lamer's

claims, and Lamer now appeals. For the reasons set forth below, we **REVERSE** the grant of

summary judgment and **REMAND** this case to the district court for further proceedings.

---

[1]The Complaint also alleges discrimination, Joint Appendix ("J.A.") at 23, 26 (Compl. at 12, 15, ¶¶ 36, 48), but Lamer does not argue that Metaldyne discriminated against him on the basis of his race. Accordingly, we construe his Title VII, § 1981, and Ohio Revised Code claims as alleging retaliation only.

# I. BACKGROUND

Lamer began working as a welder for Metaldyne's predecessor in interest, Lester Precision Die Casting, Inc. ("Lester"), in 1981. Throughout Lamer's employment with Lester, Lester maintained the following policy, set forth in the employee handbook, concerning employee absences:

> **Attendance policy**—An absence is defined as working less than six (6) hours of your normal shift. For example, if you are late more than two (2) hours, you will be considered absent. Or if you leave the plant more than two (2) hours before the end of your shift, you will be considered absent. Or, any combination of late arrivals and early exits that causes you to work less than six (6) hours of your normal shift will be counted as an absence.
>
> When you are absent for one or more consecutive work days for any reason, you will be given an attendance point. If you accumulate four (4) attendance points, a written reminder will be issued by your supervisor. Another reminder will be issued at the fifth (5th) attendance point. If you accumulate a sixth (6th) attendance point, you will be counseled by your supervisor regarding your attendance record and a written notice will be issued to you. If you accumulate a[] seventh (7th) attendance point, you will be counseled by your supervisor regarding the seriousness of the situation and will be given a final written warning. If you accumulate an eighth (8th) attendance point, your employment with Lester will end.

Joint Appendix ("J.A.") at 167 (Lamer Dep., Ex. F, at 35).

The employee handbook also provided a method for employees to expunge absences:

> **Attendance Corrective procedures**—You can correct your absence record by maintaining thirty (30) calendar days of perfect attendance following an incident of absenteeism. For example, you miss a day of work. If thirty (30) calendar days pass and you have not missed any days of work, an attendance point would be dropped. Additional attendance points would be dropped, one (1) point for each thirty (30) calendar days you work without an absence.
> * * * *
> The only way to improve your attendance record is by completing thirty (30) calendar days without an absence.

J.A. at 167-68 (Lamer Dep., Ex. F, at 35-36).

Lester additionally maintained a formal policy regarding tardiness:

**Tardiness Policy**—Tardiness is defined as being late to work two (2) hours or less, or leaving the plant two (2) hours or less before the end of your normal shift, or any combination of late arrival and early exit that adds up to two (2) hours or less in a day. If you are asked to leave the plant by your supervisor for lack of work, machine breakdown, or an act of God, for example, it will not be considered an early out.

When you are tardy or leave early, you will be given a late point. If you accumulate four (4) late points, a written reminder will be issued by your supervisor. Another reminder will be issued at the fifth (5th) late point. If you accumulate six (6) late points, you will be counseled by your supervisor regarding your tardiness record and a written notice will be issued to you. If you accumulate a seven[th] (7th) late point, you will be counseled by your supervisor regarding the seriousness of the situation and will be given a final written warning. If you accumulate an eighth (8th) late point, your employment with Lester will end.

Arriving late or leaving early on any day you are scheduled to work will be considered as tardy under this policy.

As with absences, you are expected to call in reporting that you will be late directly to your supervisor one-half hour prior to the start of your shift.

J.A. at 168 (Lamer Dep., Ex. F, at 36). An employee could improve his or her tardiness record "by maintaining thirty (30) calendar days of no tardiness following an incident of tardiness." *Id.*

Throughout his tenure at Lester, Lamer exhibited a pattern of tardiness and absenteeism. In 1987, Lamer had nine documented absences and ten "1/3 absences."[2] J.A. at 173 (May 13, 1988 Employee Reprimand). In 1988, he was absent thirteen times and "1/3 absent" sixteen times. J.A. at 180-81 (July 19, 1988 and September 27, 1988 Employee Reprimands). In 1994, Lamer failed on at least three occasions to report an absence thirty minutes before the beginning of his shift. J.A. at 189 (Dec. 8, 1994 Employee Reprimand) (noting two previous reprimands for the same violation). He accumulated at least four tardy points in 1999, J.A. at 190 (Dec. 21, 1999 Attendance Reminder/Reprimand), and a total of eight in 2000, J.A. at 191-92 (Jan. 25, 2000 and Dec. 19, 2000 Attendance Reminders/Reprimands). During his 2000 annual review, conducted on February 10,

---

[2]The record does not explain what a "1/3 absence" is.

2000, Lamer was rated below-average in attendance and punctuality. J.A. at 203 (2000 Hourly Employee Appraisal). The reviewer, supervisor Albert Overman ("Overman"), commented, "Dan is at his work station ready to go to work at the sound of the buzzer. However he needs to work on his attendance. . . . Dan has missed 6 days and has been late or left early a total of ten times. Dan, let[']s try to set a goal over the next year [to] improve your attendance." *Id.* Lamer refused to sign the review. *Id.*

On February 24, 2000, Lamer made homophobic remarks to other employees during a training course. As a result, and as a condition of retaining his employment, Lamer was required to sign a Last Chance Agreement ("LCA"). The LCA provided, in relevant part, as follows:

> The Company has determined that Lamer has engaged in inappropriate conduct in the workplace that is wholly inconsistent with [the] Company's standards and expectations. On a number of occasions Lamer has demonstrated a negative, insensitive and/or insubordinate attitude towards management and co-workers, including making disparaging and inflammatory comments about another employee's personal life. Although Lamer's conduct constitutes grounds for termination, Lester has determined that Lamer may remain employed with the Company provided that he expressly agrees to abide by the Company's policies, practices, work rules, safety rules and standards of conduct. As set forth directly below, Lamer has evidenced his commitment to abide by the Company's rules, policies, practices and standards of conduct.
>
> THEREFORE, Lamer agrees that during the remainder of his employment with Lester he will make a positive and constructive work effort and at all times:
> * * * *
> Lamer will adhere to all Company policies, practices, work rules, safety rules and standards of conduct.
> * * * *
> If in the Company's judgment Lamer violates any of the Company's rules, policies, practices and/or standards of conduct he will be subject to immediate discharge. This Agreement in no way limits the Company's right to terminate Lamer's employment for any other reason, with or without advance notice. A decision by the Company not to discipline or discharge Lamer for a violation of a Company rule, policy, practice and/or standard of conduct will not serve as or be construed as a waiver by the Company of its right to discipline or discharge Lamer for any subsequent violation.

J.A. at 195 (LCA at 1). Lamer claims that his supervisors assured him that the LCA "would not be used against him 'for anything petty.'" J.A. at 16 (Complaint at 5 ¶ 13), 139, 143 (Lamer Dep. at 167-68, 183-84).

Lamer signed the LCA on February 29, 2000, but his attendance and tardiness problems continued. On September 14, 2000, he was issued a verbal warning—which constituted Step 1 of Lester's four-step progressive discipline procedure—for failing to report an incident of tardiness at least thirty minutes prior to the start of his shift.

In late November or early December 2000, Lamer was selected to serve on a three-member peer-review panel evaluating the termination of fellow employee Derrick Marbley ("Marbley"). Lamer mentioned that fact to Overman, his direct supervisor, who, according to Lamer, "knows that if I look into something, I'm going to look into it all the way, that I get involved." J.A. at 146 (Lamer Dep. at 194-95). Lamer claims that Overman responded, "Don't get involved. . . . I'm telling you, don't get involved. Let it drop. This is a done deal already." J.A. at 146 (Lamer Dep. at 195).

Lamer went on to serve on the panel, which initially determined that Marbley's termination was unjust. When the panel communicated its decision to Lester, Lester informed the panel that Marbley had signed an LCA only one and one-half months before the incident that led to his termination. Despite Lester's denial of their request to read the alleged Marbley LCA, the panel members then reversed themselves, upholding Marbley's termination.

After the panel issued its second and final decision regarding Marbley, Lamer received a telephone call from Marbley, who insisted that he had never been issued an LCA. The following day, Lamer told Lester supervisor Stephanie Wagner ("Wagner") of his conversation with Marbley. Lamer claims to have advised Wagner that Marbley would probably complain to the Equal

Employment Opportunity Commission ("EEOC") and that, if Marbley did so, Lamer would "tell it exactly the way it happened" and would not lie for either Marbley or Lester. J.A. at 145 (Lamer Dep. at 189). According to Lamer, Wagner responded that Lester would not want Lamer to lie.

Marbley did in fact file a complaint with the Ohio Civil Rights Commission ("OCRC"), alleging that his termination was motivated by racial discrimination, and Lamer received a call from an OCRC representative.[3] When asked whether he thought Lester had discriminated against Marbley, Lamer responded, "I don't know what their reasons for terminating him were. I don't know if they gave him a Last Chance Agreement. I don't know what the deal was." J.A. at 145-46 (Lamer Dep. at 192-93). Soon after his conversation with the OCRC, Lamer told Overman that he "didn't like the way the peer review happened," that he had heard that Lester had lied about the alleged Marbley LCA, and that "[Marbley] had gone to the OCRC, and they had called [Lamer], [who] gave a statement." J.A. at 146 (Lamer Dep. at 194). Overman did not respond to Lamer's statement; "[h]e just took all of that in." *Id.*

Lamer's 2001 annual review was conducted on February 10, 2001. He once again received a below-average rating for attendance and punctuality, and Overman commented that "Dan attends meetings and is on time for them. However, I have had to talk with Dan about getting into the department at the sound of the buzzer. He has 3 missed days and has been late or left early 8 times." J.A. at 205 (2001 Hourly Employee Appraisal). Overman continued, "Dan, to improve in this area, you will have to work on your attendance. Set a goal for yourself to try and get here earlier." *Id.*

---

[3]There is some dispute concerning the date of the OCRC call. During his deposition, Lamer testified that it occurred in February 2001. J.A. at 145 (Lamer Dep. at 192). OCRC records indicate, however, that it took place on June 22, 2001. J.A. at 261 (Case Activity Log).

Lamer told Lester manager Kenneth Devorak ("Devorak"), sometime in the spring of 2001, about his conversation with the OCRC representative, saying "that I didn't agree with [the way the peer review process was conducted] if they [Lester] didn't have the documentation that they supposedly had, . . . and I said [Marbley's] got a case, and they [the OCRC] asked me for a statement, and I told them how I felt about the whole issue . . . ." J.A. at 146-47 (Lamer Dep. at 196-97). Lamer claims that Devorak responded, "The company needs Last Chance Agreements." J.A. at 146 (Lamer Dep. at 196).

Sometime in June 2001, Metaldyne purchased Lester's parent company, GMTI Holding Company. Lamer continued to work for Metaldyne in the same capacity and at the same location at which he had worked for Lester. On June 29, 2001, Lamer received a written warning for failing to call in a late arrival. That warning constituted Step 2 of the progressive discipline procedure. The next day, he received a Step 3 final warning for the same conduct. On August 27, 2001, Lamer received a Step 4 reprimand, once again for the same type of violation, and his employment was terminated, effective August 29, 2001, as indicated by a termination memorandum prepared by Overman:

> This letter is to document the termination of Mr. Dan Lamer[,] Welding Coordinator/Die Repairman 1st shift with Metaldyne in Twinsburg. After discussions between Ken Devorak and myself over Mr. Lamer's fourth failure to call in a late arrival one half hour prior to the start of his shift, it was decided to terminate his employment.
> Mr. Lamer was given every consideration and offered help by the company at his third violation of this offense, which he refused. On 8/27/01, Mr. Lamer failed to call in his late arrival one half hour prior to the start of his shift, which was his fourth offence [sic]. According to the Metaldyne Employee Handbook, the fourth offense is reprimanded by discharge.
> On 8/27/01, Ken Devorak, Stephanie Wagner and myself discussed this reprimand with Mr. Lamer. Mr. Lamer expressed his opinions saying the company has been out to get him. I, Al Overman, explained that this was not the case. Mr.

7

Lamer requested that his termination be forwarded to Peer Review. It was decided that his last chance agreement that he had previously signed and agreed to[] is what will be used to terminate his employment and this does not take into consideration Peer Review. The meeting ended with Mr. Lamer['s] termination and it[s] not being forwarded to Peer Review. As of 8/29/01, Mr. Lamer is officially terminated.

J.A. at 218 (Termination Mem.).

Lamer timely filed suit in the United States District Court for the Northern District of Ohio, alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); 42 U.S.C. § 1981; and OHIO REV. CODE ANN. § 4112.02(I) (West 2001); and wrongful discharge in violation of federal and Ohio public policy. The district court granted summary judgment in favor of Metaldyne on all of Lamer's claims, and Lamer now appeals.

## II. JURISDICTION

The district court possessed federal-question jurisdiction over Lamer's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Lamer's state claims pursuant to 28 U.S.C. § 1367(a). We have appellate jurisdiction under 28 U.S.C. § 1291.

## III. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing the absence of any genuine issues of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). Once the movant has satisfied its burden, the nonmoving party must produce evidence showing that a genuine issue remains. *Id.*

8

The court must credit all evidence presented by the nonmoving party and draw all justifiable inferences in that party's favor. *Id.* The nonmovant must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment is proper when the nonmoving party has had adequate time for discovery and yet "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. We review a district court's grant of summary judgment de novo. *See, e.g.*, *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006).

## B. Lamer's Retaliation Claims

Lamer asserts retaliation claims pursuant to Title VII, 42 U.S.C. § 1981, and OHIO REV. CODE ANN. § 4112.02(I). All of these claims are analyzed under the framework used for evaluating Title VII claims. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 541 (6th Cir. 2003) ("Because the Ohio Supreme Court has held that an action under Ohio Revised Code § 4112 mirrors that under Title VII, we will analyze plaintiff's state and federal claims of illegal retaliation solely under Title VII." (internal citation omitted)); *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001) (holding that § 1981 retaliation claims "are governed by the same burden-shifting standards as . . . claims under Title VII").

### 1. Lamer's Prima Facie Case

Because Lamer concedes that he does not possess direct evidence of discrimination, we apply the burden-shifting test set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002) ("In

the absence of direct evidence, retaliation claims are governed by the *McDonnell Douglas* burden-shifting framework.").

> In order to establish a prima facie case of retaliation, the plaintiff must show: (1) that the plaintiff engaged in a protected activity; (2) that the defendant had knowledge of the plaintiff's protected conduct; (3) that the defendant took an adverse employment action towards the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Id.*

The district court concluded that Lamer had established a prima facie case of retaliation. Metaldyne contends that that determination was in error because Lamer has not established the fourth, or causation, prong of his claim. Lamer first responds by pointing out that Metaldyne did not cross-appeal the district court's disposition of this issue and arguing that it is not, therefore, properly before this court. Lamer is incorrect:

> It is true that a party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought there by the appeal of the adverse party. In other words, the appellee may not attack the decree *with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary*, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below. But it is likewise settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, *although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.*

*United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924) (emphases added), *quoted in United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 349 n.3 (6th Cir. 1998).

Here, as in *American Railway*, the appellee "does not attack, in any respect, the decree entered below. It merely asserts additional grounds why the decree should be affirmed." *American Ry.*, 265 U.S. at 435-36 (footnote omitted); *see also Washington v. Confederated Bands & Tribes*

10

*of Yakima Indian Nation*, 439 U.S. 463, 476 n.20 (1979) ("As the prevailing party, the appellee was of course free to defend its judgment on any ground properly raised below *whether or not that ground was relied upon, rejected, or even considered by the District Court or the Court of Appeals*." (emphasis added)); *Swarb v. Lennox*, 405 U.S. 191, 202 (White, J., concurring) ("[I]t is . . . well-established that the prevailing party below need not cross-appeal to entitle him to support the judgment in his favor *on grounds expressly rejected by the court below*." (emphasis added)). Accordingly, we reach the merits of Metaldyne's argument.

"To show causation, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct." *Weigel*, 302 F.3d at 381 (internal quotation marks omitted). "Although no one consideration is dispositive, a causal link may be shown through knowledge combined with closeness in time." *Id.* (internal quotation marks and brackets omitted). In other words, "[t]here are . . . circumstances where temporal proximity, considered with other evidence of retaliatory conduct[, is] sufficient to establish a causal connection." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007).

The district court determined that Lamer had adduced sufficient evidence to satisfy the causation prong of his prima facie case by showing that: (1) "the adverse employment action occurred within a few months of his giving his witness statement to the EEOC/OCRC investigator"; (2) "he was not disciplined for tardiness until after he engaged in the protected activity"; and (3) "a supervisor warned him not to get involved in the peer review of the African-American employee." J.A. at 46 (Dist. Ct. Mem. & Op. at 8). That conclusion is supported by *Tuttle*, in which the plaintiff alleged that, shortly after she filed an EEOC complaint and shortly before she was terminated, a

11

manager "threatened her that he was going either to demote her or to cut her wages if she did not transfer voluntarily into another . . . department." 474 F.3d at 321. "Tuttle viewed [the threat] as a reaction to her EEOC complaint." *Id.* (footnote omitted). We held that, "in light of the close proximity of time [three months] between Tuttle's first EEOC filing and her subsequent termination and Tuttle's trial testimony about Walker's verbal threats . . . , Tuttle presented sufficient evidence to support a jury's finding that her EEOC complaint . . . caused her termination." *Id.*

In the instant case, while no Metaldyne supervisor explicitly threatened Lamer, Overman's warning that Lamer should not involve himself in the Marbley peer review, combined with the mere five months, at most, that elapsed between Metaldyne's learning of Lamer's communication with the OCRC and the termination of Lamer's employment,[4] could lead a reasonable jury to conclude that a causal connection existed between Lamer's protected activity and his firing. Accordingly, the district court was correct in concluding that Lamer has established a prima facie claim of retaliation.

## 2. Lamer's Evidence of Pretext

"Because [Lamer] establishes the prima facie case, the burden of production shifts to [Metaldyne] to articulate a legitimate, non-retaliatory explanation for the action." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004). The parties agree, and the district court concluded, that Metaldyne has satisfied its burden:

> Defendants have offered ample evidence of numerous reprimands, warnings and write ups given to Plaintiff for absenteeism/tardiness prior to his engaging in protected activity. Furthermore, the LCA allowed Defendants to discharge Plaintiff for any additional violation of the Company rules, policies, procedures or standards of conduct. Finally, Plaintiff does not dispute that he was, in fact, tardy when he was reprimanded.

---

[4]As noted supra, the call occurred in either February or, more likely, June 2001.

J.A. at 47 (Dist. Ct. Mem. & Op. at 9).

"[O]nce the employer has come forward with a nondiscriminatory reason for firing the plaintiff, . . . the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994).

> To make a submissible case on the credibility of his employer's explanation, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge. The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are factually false. The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed a suspicion of mendacity. . . . [S]uch a showing permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case.
>
> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup.

*Id.* at 1084 (internal quotation marks and citations omitted). Lamer contends that he has made all three types of showing.

First, Lamer argues that he did not actually violate Metaldyne's tardiness policy on each of the four occasions for which he was disciplined and eventually terminated. He points out that the

13

policy contains an exception for extenuating circumstances and argues that the first of the four alleged violations should have been excused under the exception, because Overman knew of the traffic accident that delayed Lamer's arrival at work that day.

The employee handbook provides that extenuating circumstances must be "approved by [a] supervisor and human resources." J.A. at 165 (Lamer Dep., Ex. F, at 33). The evidence does not support Lamer's contention that he was entitled to such approval. Overman's documentation of the verbal warning indicates that Overman was notified by another employee that *road construction*, not an accident, was slowing traffic. Moreover, that employee—who notified Overman of the construction due to concern that he himself might arrive late—was not, in fact, delayed past starting time by the traffic. Finally, Overman "had personnel run a report to see if anyone else punched in late" that day, and discovered that only one person besides Lamer had done so. J.A. at 208 (Sept. 18, 2000 Employee Reprimand at 2). In light of these facts, and in the absence of any evidence that Metaldyne's policy required Overman to excuse tardiness under these circumstances, we hold that the district court correctly determined that Lamer had not established pretext on this ground.

Lamer also attacks Metaldyne's invocation of the LCA as authorizing his termination, on the ground that Metaldyne was not a party to the LCA and thus lacked the power to enforce it. In response, Metaldyne points out that it acquired Lester as a "going concern" and maintained all of Lester's employment policies and practices. Neither party cites any case law regarding the rights and obligations of a successor corporation regarding the employees of its predecessor corporation. Because "the ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against the plaintiff remains at all times with the plaintiff," *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (internal quotation marks and brackets omitted), and because Lamer has

14

offered neither evidence nor precedent in support of his contention that Metaldyne could not, or did not, rely on the LCA, the district court correctly rejected his second argument.[5]

Lamer next argues that Metaldyne's refusal to grant peer review of his termination demonstrates that it did not terminate him pursuant to the LCA, which, he notes, does not expressly prohibit such review. He points out that Marbley, who was supposedly terminated pursuant to an LCA, was nonetheless granted peer review. Lamer has not, however, produced Marbley's LCA or any evidence of its contents (or, indeed, of its existence), and thus we cannot determine with any certainty that the relevant provisions of the two agreements are "nearly identical," as they must be to establish the relevance of an employer's treatment of similarly situated employees. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks omitted).

Lamer also asserts that he was told, when he signed his LCA, that it would not be used to discipline him for "petty" offenses. Appellant Br. at 39. But, as Lamer himself points out, "[p]arol evidence cannot add terms to a fully integrated, unambiguous agreement; nor can it contradict an agreement's existing, unambiguous terms." *Constr. Interior Sys., Inc. v. Marriott Family Rests., Inc.*, 984 F.2d 749, 757 n.4 (6th Cir.), *cert. denied*, 510 U.S. 869 (1993); *see also* Appellant Br. at 37-39. The LCA unambiguously provides that Lamer is subject to "immediate discharge" for violation of "any of the Company's rules, policies, practices and/or standards of conduct." J.A. at 195 (LCA at 1). It makes no exception for "petty" offenses, and Lamer's claims that he was orally assured to the contrary are thus unavailing.

___

[5]We note that, even if the LCA was in fact voided by Metaldyne's acquisition of Lester, Metaldyne's good-faith, though erroneous, belief that the LCA applied would preclude a finding of pretext. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 806-08 (6th Cir. 1998).

Finally, Lamer contends that Metaldyne's treatment of him before he engaged in protected activity is relevant for purposes of the "similarly situated" analysis. In support of this theory, he cites *Cantrell v. Nissan N. Am., Inc.*, in which we held that, "where an employer treats an employee differently after she asserts her rights . . . than before she had done so, a retaliatory motive may be inferred" for purposes of the prima facie case, and that "the same circumstances which establish[] a causal connection . . . also serve as sufficient evidence" of pretext. 145 F. App'x 99, 105-07 (6th Cir. 2005) (unpublished); *see also DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 394 (6th Cir. 2005) (unpublished) ("[A]lthough DeBoer's performance evaluation indicating that she needed improvement occurred many months before she announced her pregnancy, Musashi did not have a negative reaction to DeBoer's allegedly poor supervisory skills under after she announced her pregnancy."); *Walborn v. Erie County Care Facility*, 150 F.3d 584, 588-89 (6th Cir. 1998) (implying that an employee can satisfy the "similarly situated" requirement by pointing to his own past performance and treatment).

On this point, Lamer is correct. Metaldyne did not terminate his employment pursuant to the LCA for any of the many policy violations that he committed before engaging in protected conduct. *See* J.A. at 207 (Employee Reprimand noting Lamer's failure to call in an incident of tardiness on Sept. 18, 2000), 192 (Attendance Reminder/Reprimand noting his accumulation of four tardy points as of Dec. 18, 2000), 193 (Attendance Reminder/Reprimand noting his accumulation of four tardy points as of Apr. 10, 2001). And while the LCA expressly disclaims any general waiver of the right to terminate arising from Metaldyne's failure to enforce the LCA on a particular occasion, J.A. at 195 (LCA at 1), Metaldyne's general right to take such action does not give it a license to do so for

16

reasons prohibited by law, *see, e.g.*, *Williams v. London Util. Comm'n*, 375 F.3d 424, 428 (6th Cir. 2004).

In any event, counsel for Metaldyne stated during oral argument that Metaldyne had terminated Lamer pursuant to the progressive-discipline policy, not the LCA. It is undisputed that an employee terminated under Metaldyne's progressive-discipline system is entitled to peer review, as indicated by the employee handbook, which states that, "[i]n the case of an employee discharge, the first[] and second steps of this problem[-]handling procedure will be waived and a request for meeting with the plant manager [Step 3 of the peer-review process] *will be accepted* if submitted within three (3) days of the discharge." J.A. at 271 (Employee Handbook at 6) (emphasis added). Overman's termination memorandum also implicitly concedes that peer review must be made available to an employee fired pursuant to the progressive-discipline system:

> Mr. Lamer was given every consideration and offered help by the company at his third violation of this offense, which he refused. *On 8/27/01, Mr. Lamer failed to call in his late arrival one half hour prior to the start of his shift, which was his fourth offence [sic]. According to the Metaldyne Employee Handbook, the fourth offense is reprimanded by discharge.*
> On 8/27/01, Ken Devorak, Stephanie Wagner and myself discussed this reprimand with Mr. Lamer. Mr. Lamer expressed his opinions saying the company has been out to get him. I, Al Overman, explained that this was not the case. *Mr. Lamer requested that his termination be forwarded to Peer Review. It was decided that his last chance agreement that he had previously signed and agreed to[] is what will be used to terminate his employment and this does not take into consideration Peer Review.* The meeting ended with Mr. Lamer['s] termination and it[s] not being forwarded to Peer Review. As if 8/29/01, Mr. Lamer is officially terminated.

J.A. at 218 (Termination Mem.) (emphases added).

Evidence that the progressive-discipline policy asserted as a rationale for an employee's termination was not uniformly applied is evidence of pretext. *Harrison v. Metro. Gov't*, 80 F.3d 1107, 1117 (6th Cir. 1996), *overruled on other grounds*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17,

17

19-20 (1993), *as recognized in Jackson v. Quanex Corp.*, 191 F.3d 647, 667 n.6 (6th Cir. 1999). Accordingly, because Lamer has satisfied his burden at the third step of the *McDonnell Douglas* analysis by providing evidence that Metaldyne's asserted legitimate, non-discriminatory reason for his termination was a mere pretext for discrimination, the district court erred in granting summary judgment in favor of Metaldyne.

## IV. CONCLUSION

Because Lamer has established a prima facie case of retaliation and has rebutted Metaldyne's asserted rationale for his termination with evidence of pretext, we hereby **REVERSE** the district court's grant of summary judgment in favor of Metaldyne and **REMAND** this case for further proceedings consistent with this opinion.

**ALICE M. BATCHELDER, dissenting.** "To make a submissible case [based] on the credibility of his employer's explanation [i.e., to survive summary judgment], the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that [the proffered reasons] were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). Lamer was late on four occasions within a one-year period, which is sufficient to motivate discharge at Metaldyne. Therefore, the majority finds, and I agree, that Lamer cannot prove pretext under either of the two objective methods (i.e., numbers one and three).

Under the second method, "the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Id.* Thus, the question on summary judgment is whether Lamer presented circumstantial evidence sufficient to permit a jury to find that Metaldyne's true motive for firing him was more likely to retaliate for his statements to the OCRC than to remedy his unacceptable tardiness. Before proceeding to Lamer's arguments — both of which I find insufficient in their own right — I note that, by Lamer's own account, his statements to the OCRC were rather innocuous and Marbley's OCRC claim against Metaldyne was unsuccessful. Nothing in the record suggests that Metaldyne suffered any consequence from either Marbley's claim or Lamer's support of that claim. Other than Lamer's unsubstantiated accusations, nothing in the record suggests that Metaldyne even perceived or anticipated any consequences from Marbley's claim or Lamer's statements to the OCRC.

Lamer points to the fact that he was denied his right to peer review under Metaldyne's progressive-discipline system and cites *Harrison v. Metro. Gov't*, 80 F.3d 1107, 1117 (6th Cir. 1996)

19

(overruled on other grounds), for the proposition that the non-uniform application of the progressive-discipline system may be evidence of pretext. I note that the employer's conduct in this case falls well short of the conduct depicted in *Harrison*, and therefore, I question whether *Harrison* is applicable. Even if I were to assume that it is, however, Lamer had to provide evidence that there was a non-uniform application of the progressive-discipline program. He has not done so; his inference of non-uniform application is not enough. Finally, even if I were to assume that Lamer had shown a non-uniform application, I would hold that he has not raised a genuine issue for trial that Metaldyne's true motive for firing Lamer was as a retaliation for his statements to the OCRC (i.e., as evidence of pretext). Lamer was a party to a Last Chance Agreement, and was not entitled to peer review.

Lamer also points to Metaldyne's failure to terminate him for his tardiness prior to his OCRC statements and cites to this court's unpublished opinions in *Cantrell v. Nisson N. Am., Inc.*, 145 Fed. App'x 99 (6th Cir. 2005), and *DeBoer v. Musashi Auto Parts, Inc.*, 124 Fed. App'x 387 (6th Cir. 2005), for the proposition that the failure to discipline an employee before the protected activity, coupled with the discipline of the employee for that same misbehavior after the protected activity, may be evidence of pretext. In both of those cases, however, the employee was terminated for his history of misbehavior that had occurred (and been allowed) prior to the protected activity, without any further actionable misbehavior occurring after the protected activity. In the present case, Lamer displayed actionable misbehavior after the protected activity that was sufficient, at least on its face, to justify his termination without any reference to, or need to reference, his prior misbehavior.

I agree with the district court that Lamer failed to make the necessary showing of pretext, and therefore, he could not survive summary judgement. Therefore, I must respectfully dissent.