NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0479n.06

Case No. 15-2318

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 16, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KIMBERLY HARTMAN, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DOW CHEMICAL COMPANY, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: SILER, GIBBONS, and KETHLEDGE, Circuit Judges.

**SILER, Circuit Judge.** Discharged employee Kimberly Hartman brought an action against her former employer, Dow Chemical Company, alleging that the company violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, by terminating her after she returned from leave. A jury found Dow liable and awarded Hartman damages. Dow appeals the district court's denial of its motion for judgment as a matter of law. For the reasons explained below, we **REVERSE** the district court and **REMAND** for an entry of judgment in favor of Dow.

**I.**

Hartman began working for Dow in 2010. Her supervisor was John "Jack" Ingold, but Hartman primarily performed administrative support for attorney Toby Threet and paralegal

Stacy McKeon. The majority of Hartman's work required her to be online and connected to Dow's network—either while at Dow or using its virtual private network ("VPN") while not in the office.

In April 2013, Hartman contacted her team at work—which included Ingold, Threet, and McKeon—to inform them that she would need time off for surgery. Hartman's leave began on May 28, 2013, and she underwent surgery on May 30. In June, Hartman told her team that she had an upcoming doctor's appointment on July 15, and that she hoped it would result in her being cleared to work. However, after that appointment, Hartman informed her team that she needed to extend her leave by four weeks. She returned to work part time on July 29, and resumed a full-time schedule on August 20. Her entire absence was approved under the FMLA.

Ingold received a voicemail message from Threet on July 15 informing him that Hartman was seen by a coworker displaying a good range of motion and that "she was feeling pretty good," which called into question her need for additional recovery time. Threet was concerned that Hartman was committing timecard fraud and suggested holding an employee review meeting ("ERM") at that time. Threet said that Ingold later told him that "the decision had been made" not to hold an ERM while Hartman was on leave. However, Ingold testified that Threet's statement was inaccurate and that there had never been any possibility of an ERM. Ingold asked Hartman for additional confirmation from her doctor, which was received and found satisfactory. Hartman testified that Ingold acted "standoffish" and "curt" when Hartman delivered the doctor's note, which she thought was unusual.

Around the time that Hartman initially requested medical leave, McKeon became concerned about Hartman's hours. Hartman worked an "alternate Friday off" ("AFO") schedule that allowed her to have every other Friday off if she had completed the necessary hours.

McKeon suspected that Hartman was leaving earlier than normal.[1]  As a result, she began taking notes on Hartman's arrivals and departures.  McKeon provided Ingold with this information around the May 2013 "time frame."  Additionally, Dana Chauvette, the intern assigned to Hartman's position while she was on leave, noticed that most of the work Hartman left for her to do was either late or done incorrectly.  When Threet was presented with this information, he became aware of several problems with Hartman's work performance.[2]

Upon Hartman's return to work, her coworkers continued monitoring her arrivals and departures.  Hartman also testified that the atmosphere at work had changed after her medical leave.  In September, Threet sent an update on Hartman's work schedule to Ingold since it still did not seem that she was working the hours she needed.  This email ended with, "Do we have enough now to take action? Please?"  Ingold forwarded the email to a human-resources representative, but without the plea.  After this, Hartman's coworkers continued to record what Hartman did when she was not working, such as when she used her personal phone or the computer for personal matters.

Ingold was concerned at this point, so he began gathering objective evidence of Hartman's time at work by getting her gate records.  There was a sixty-hour discrepancy between Hartman's timecards and her gate records.  When asked to explain this difference, Hartman said that she worked at home every night for two to two-and-a-half hours.  Hartman further explained that her VPN records might not reflect this because she did not always connect to the VPN when

---

[1] Hartman was supposed to work a total of eighty hours over a nine-day period, which allowed her to take every other Friday off since she would have already worked all her required hours.  McKeon explained that while Hartman normally left around four o'clock, McKeon noticed that she had been leaving around two or three o'clock instead.

[2] Not long after Hartman went on leave, Chauvette went to Threet for help in completing a task that Hartman had left for Chauvette.  Threet discovered that this task was one that had been assigned to Hartman "long ago" and involved matters that were months or even a year late.  Additionally, Threet discovered that Hartman had been incorrectly completing invoices.  Threet also found out that Hartman was not being assigned much work by McKeon due to McKeon's fears that it would not be done correctly.  This is when they started paying attention to all of the "non-work activities" that Hartman engaged in, such as texting or spending time on Facebook.

working at home.  Ingold was suspicious that Hartman could work without connecting to the VPN and thus did not believe her explanation.  Hartman was then placed on administrative leave.

Upon analyzing Hartman's VPN records from mid-August through late September, Ingold found that she had only connected to the VPN on two occasions.  On one of these occasions, Hartman accessed the VPN because she was working from home while sick, not because she was getting additional hours after work.  After this discovery, Ingold scheduled an ERM.  Participants in the ERM[3] considered only the objective evidence:  Hartman's gate records, VPN records, timecard records, and her explanation.  They concluded that they should terminate Hartman's employment because of timecard fraud.  In a separate meeting, Ingold communicated to Hartman the ERM's decision to terminate her for timecard fraud.  When Hartman commented that the timing was suspicious due to her medical leave, Ingold stated that it had nothing to do with her leave.

Hartman subsequently commenced this action, alleging that her termination constituted both interference and retaliation in violation of the FMLA.  She also claimed that Dow violated the Michigan Persons with Disabilities Civil Rights Act.  The district court granted summary judgment to Dow on Hartman's interference and disability-discrimination claims but denied it on the retaliation claim.

At the conclusion of the jury trial, Dow made a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, which the court took under advisement.  The jury then found for Hartman and awarded her $50,310.00 in lost wages and $122,297.00 for future damages.  Upon denying Dow's renewed motion for judgment as a matter of law, the court concluded that Hartman presented sufficient evidence that Dow terminated her for her use of

---

[3] The participants at the ERM were Ingold, two human resource representatives, a neutral manager, and an attorney.

FMLA leave. The court pointed specifically to the close temporal proximity between Hartman's leave, her coworkers' monitoring, and her termination—in addition to the testimony and actions of Threet—as support for her FMLA claim.

## II.

"We review de novo the decision of a district court on a motion for judgment as a matter of law, applying the same standard used by the district court." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 818 (6th Cir. 2013). "The evidence should not be weighed, and the credibility of the witnesses should not be questioned." *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 804 (6th Cir. 2015) (quoting *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012)).

## III.

A plaintiff may recover against her employer for a violation of the FMLA under two distinct theories of liability: the "interference" or "entitlement" theory and the "retaliation" or "discrimination" theory. *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003). The "retaliation" theory imposes liability on an employer that "discharge[s] or in any other manner discriminate[s] against any individual for opposing any practice made unlawful by this [Act]." 29 U.S.C. § 2615(a)(2).

> To establish a prima facie claim for retaliation, a plaintiff must demonstrate that:
>
> (1) [s]he engaged in an activity protected by the Act; (2) that this exercise of h[er] protected rights was known to the defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Arban*, 345 F.3d at 404. If a plaintiff establishes a prima facie case, the burden shifts back to the employer to articulate a non-discriminatory basis for terminating the employee. *See, e.g.*, *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). Finally, once the employer provides its

non-discriminatory reason, the employee may rebut the employer's basis by showing that it was pretext for retaliation. *See Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 431-32 (6th Cir. 2014). "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

**IV.**

This appeal centers on what constitutes evidence of pretext. Hartman proceeded to trial on two theories of pretext: that Dow's reason for terminating her for timecard fraud had no basis in fact and that it did not actually motivate Dow. The district court rejected Hartman's reliance on the first theory but found sufficient evidence to deny Dow's Rule 50 motion based on her second theory. On appeal, Dow contends that while the district court correctly rejected Hartman's first theory, it erred in its analysis of the second theory.

A.

Dow maintains that Hartman cannot demonstrate that its decision to terminate her had no basis in fact because Dow honestly believed that she committed timecard fraud. The district court agreed with Dow in both its summary judgment opinion and order denying Dow's Rule 50 motion. On appeal, Hartman largely fails to contest this issue.

A plaintiff can attack the credibility of the employer's non-discriminatory reason for termination by proving that the employer's reason lacks a factual basis. *Seeger*, 681 F.3d at 285. However, the employer can defeat that attack by explaining that it had an honest belief in the reason it gave for the termination. *Id.* "This court has adopted an 'honest belief' rule with regard to an employer's proffered reason for discharging an employee." *Majewski v. Automatic*

*Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)).

The evidence that can be used to support the employer's honest belief and the resulting decision varies, but it often involves some kind of investigation. *See, e.g.*, *id.*; *Chrysler*, 155 F.3d at 808. Courts have accepted employment decisions based on other types of evidence, such as records, eyewitness accounts, and information provided by the employee, but they have rejected decisions based entirely on unsupported personal opinions. *Compare Seeger*, 681 F.3d at 287 (finding that a decision based on medical records and various testimony—including from the plaintiff himself—was satisfactory), *with Chrysler*, 155 F.3d at 808 (rejecting a belief that was primarily based on a personal opinion).

Here, Dow points to specific evidence that supports its belief that Hartman was committing timecard fraud. The decisionmakers at the ERM looked to the objective evidence they had collected, and that evidence—the timecard records, gate records, VPN records, and Hartman's explanation—led to their unanimous decision to terminate Hartman for timecard fraud. Therefore, Dow is able to cite specific evidence that supports its belief that Hartman was committing timecard fraud.

Hartman questions a specific result from the investigation—the accuracy of the calculations that led Dow to conclude there was a sixty-hour discrepancy between her timecard entries and the gate records. Hartman claims that this number is the result of "over-count[ing]" by rounding numbers and counting vacation days against her. While Hartman is permitted to discredit Dow's alleged honest belief, she must do more than just disagree with a fact that led to her termination. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001); *Chrysler*, 155 F.3d at 807-08. Instead, she must focus on the investigatory process and the resulting

decision. *See Seeger*, 681 F.3d at 285-86. This requires a specific showing that the employer's decision-making process was not "reasonably informed and considered" and is thus not worthy of belief. *Chrysler*, 155 F.3d at 807-08.

While Hartman may challenge some of the methods that Dow used to discover the discrepancy between the timecards and the gate records, Dow did not have to use every available method in order to more accurately determine the extent of Hartman's supposed timecard fraud. *See Chrysler*, 155 F.3d at 807 (explaining that a "reasonably informed and considered decision" does not require that the employer "le[ave] no stone unturned"). Rather, as the evidence demonstrates, Dow made a reasonable decision that was based on the available facts. *See Seeger*, 681 F.3d at 285. Therefore, the extent of Dow's investigation, while perhaps imperfect, was satisfactory.

Additionally, the fact that Dow's reported discrepancy is potentially an overstatement does not automatically transform its honest belief into pretext for the purposes of a retaliation claim. The honest belief rule will continue to shield an employer even if it is later discovered that its belief was incorrect. *Majewski*, 274 F.3d at 1117; *see also Seeger*, 681 F.3d at 287 (explaining that the employer's honest belief would still be valid even if the court reached a different conclusion based on the investigation). As this court has previously explained, it does not matter whether the employee actually committed fraud—what matters is if the employer honestly believed that the employee did. *Seeger*, 681 F.3d at 286. Here, Dow honestly believed that Hartman committed timecard fraud based on the facts presented at the time. This honest belief shields Dow from Hartman's claim that the proffered reason was factually baseless. Accordingly, Hartman has failed to prove that Dow's stated reason for terminating her had no basis in fact.

B.

The primary dispute in this case is whether the district court properly denied Dow's Rule 50 motion on the basis that Hartman presented sufficient evidence to show that her use of FMLA leave actually motivated Dow's decision to terminate her. When pursuing the second method of demonstrating pretext, the plaintiff "attacks the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant.'" *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id*. (citing *Manzer*, 29 F.3d at 1084).

Dow advances two arguments to support its claim that the district court erred. First, Dow contends that the district court's two bases for finding evidence of pretext—temporal proximity and Threet's email and testimony—"are inadequate as a matter of law to prove that timecard fraud did not actually motivate Dow's decision to terminate Hartman." Second, Dow asserts that the district court erred by permitting Hartman to argue two incompatible theories of pretext to the jury.

1.

The district court's analysis of temporal proximity primarily centered on a series of three events: (1) when Hartman used FMLA leave; (2) when Hartman's co-workers started monitoring her time; and (3) when Dow decided to terminate her. With respect to the time between the first and second events, the district court noted that McKeon started monitoring Hartman's absences shortly after Hartman sent an email to her co-workers regarding her intent to

use FMLA leave. Additionally, the district court found relevant that not only did McKeon continue to keep track of Hartman's time after she returned from leave, but the evidence also suggested that Ingold had requested McKeon keep track of that information at a later point. According to the district court, "[t]his monitoring, in turn, precipitated the investigation into Plaintiff's gate record and VPN log-in times."

Dow contests both the factual and legal conclusions of the district court, particularly the significance placed on McKeon's decision to monitor Hartman. Dow notes that it was McKeon's initiative, not Ingold's, that resulted in the monitoring of Hartman's time. Moreover, Dow argues that, even if Hartman's use of FMLA leave triggered its review of Hartman's timecard information, such an action "cannot logically be evidence that the FMLA leave caused the termination." Simply put, Dow takes the position that it does not matter who initiated the investigation into Hartman, or why they did, because employers are permitted to determine employee violations regardless of the use of FMLA leave.

Dow is correct to suggest that temporal proximity between the start of an investigation into an employee's misconduct and the use of FMLA generally does not itself provide sufficient evidence of animus. *See Hall v. Ohio Bell Tel. Co.*, 529 F. App'x 434, 440-41 (6th Cir. 2013). Here, however, the district court, relying on *Lamer v. Metaldyne Co. LLC*, 240 F. App'x 22 (6th Cir. 2007), makes a slightly different point—that the greater scrutiny Hartman received from co-workers *after* she gave notice of her leave provided evidence of retaliatory animus. And based on Hartman's post-FMLA treatment, the district court found that "the jury could infer from the evidence Plaintiff produced that the investigation was motivated by her colleagues' frustration with her FMLA leave and not her alleged misreporting of work time after her return."

In *Lamer*, during the plaintiff's tenure with his employer, he had "exhibited a pattern of tardiness and absenteeism." 240 F. App'x at 24. For employee infractions, the employer utilized a four-step discipline procedure. *Id*. at 25-26. Before the plaintiff engaged in a protected activity, he had received a verbal warning for tardiness, which was the first step in the progressive discipline procedure. *Id*. However, after the plaintiff engaged in the protected activity, he received a series of reprimands for excessive tardiness that moved him from the second step to the fourth step in a short period. *Id*. at 27. His employer ultimately terminated him. *Id*.

The district court granted summary judgment in favor of the employer, but we reversed, finding that the plaintiff had put forth sufficient evidence to dispute whether his use of FMLA leave actually motivated the adverse employment action. *Id*. at 33. Key to our decision was the fact that "the progressive-discipline policy asserted as a rationale for an employee's termination was not uniformly applied." *Id*. (citation omitted). Particularly, we noted that the employer did not terminate the plaintiff's employment "for any of the many policy violations that he committed *before* engaging in protected conduct." *Id*. at 32 (emphasis added). And because of this, we concluded that retaliatory animus could be inferred. *Id*.; *see also Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 105-06 (6th Cir. 2005) ("[W]here an employer treats an employee differently after she asserts her rights . . . than before she had done so, a retaliatory motive may be inferred." (citing *Walborn v. Erie Cty. Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998))).

As Dow correctly argues, the facts of this case are distinguishable from those of *Lamer*. Here, unlike *Lamer*, all the evidence indicates that Hartman's co-workers, not Ingold, decided to start monitoring Hartman's time. Moreover, even if Ingold had started to investigate timecard issues with Hartman after she gave notice of FMLA leave, there is no indication that Ingold was

aware of any problems before she took leave. For *Lamer* to be relevant, Ingold would have needed to know about Hartman's alleged timecard fraud, initially ignored it, and then taken action after Hartman used her leave. But the record does not support any such finding here.

Finally, Dow argues that retaliatory animus may not be inferred from the fact that it terminated Hartman shortly after she returned from FMLA leave. In other words, Dow believes temporal proximity alone is not enough to establish an inference of animus. Although our precedent permits a plaintiff to establish a prima facie showing of a causal connection based solely on temporal proximity, *see Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524-25 (6th Cir. 2008), "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext," *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001)). But "suspicious timing is a strong indicator of pretext *when accompanied by* some other, independent evidence." *Seeger*, 681 F.3d at 285 (emphasis added) (quoting *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009)). Therefore, we must determine whether other "independent evidence" exists.

2.

Dow advances two challenges to the district court's finding that Threet's email to Ingold evidenced discriminatory animus toward Hartman's use of FMLA leave. First, Dow asserts that, contrary to the district court's assessment, Threet's email lacked any language to suggest retaliatory animus. Second, Dow argues that any language in the email suggesting retaliatory animus cannot be imputed to the company because Threet was not a decisionmaker.

In assessing the impact of Threet's email on Dow's decision to terminate Hartman, the district court applied the four-factor analysis articulated by *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477-78 (6th Cir. 2002). *Peters* applies when assessing whether a comment in the workplace

reflects a bias on the part of the employer toward a protected class or protected activity. 285 F.3d at 477. Although Dow claims that the district court incorrectly analyzed the *Peters* factors, it seeks to undermine a more fundamental point—that Threet's email contained a discriminatory remark. According to Dow, the district court lacked any basis to conclude that Threet's email evidenced retaliatory animus; rather, the email, Dow believes, indicates that Threet's "motivations were (1) offense that Hartman was defrauding Dow, and (2) a desire to retain Chauvette." The entirety of Threet's email is as follows:

> Jack, I have an update for you. Kim is taking her AFO (alternate Friday off) today. My understanding is that, in order to get an AFO, one must work an extra hour (approximately) on the other workdays of the two-week period. So far as I can determine, Kim has not been doing that. She has been arriving after 8 AM (usually in the range of 8:05 to 8:15), and usually leaves by 4 PM. Per Stacy, Kim has been taking at least an hour for lunch each day, which means the 4 PM departures (or earlier) do not constitute the use of her lunch hour. So instead of working approximately 9 hours per day to qualify for the AFO, she has mostly been working slightly less than 7 hours per day. And she still took the AFO. At first glance, this would appear to be time card fraud. It would be the second identified instance. (The first would relate to Connie Bailey's account, when Kim was off work.) Kim is no longer on medical restrictions, so that is no longer an issue.
>
> It also appears that Stacy, Dana[,] and I have all noted that when Kim is in the office, she spends an unusual amount of time doing things other than work. I have seen Kim texting a lot. Stacy says Dana has encountered Kim doing Facebook on several occasions. Granted, everyone does some amount of personal stuff, and that's OK. But we really don't see a lot of work output from Kim.
>
> Meanwhile, Dana is doing most of Kim's work. Dana is largely past the learning curve, and is out-performing Kim. And Dana is looking for other jobs so that she can get benefits.
>
> Do we have enough now to take action? Please?

On its face, Threet's plea at the end of his email cannot constitute direct evidence of FMLA animus. To illustrate, in *Curry v. Brown*, we examined whether the supervisor's

statements that the plaintiff "needed to focus on her health problems, transfer . . . and it would be less stressful," and that "she should probably focus on her health rather than worry about the stress of supervising people" constituted evidence of retaliatory animus. 607 F. App'x 519, 523 (6th Cir. 2015) (internal quotation marks omitted). We found those statements lacking in discriminatory animus because the supervisor made *no mention of the plaintiff's use of FMLA leave*. *Id*. at 524. Likewise, here, there is no mention of FMLA leave in Threet's email when he asked, "Do we have enough now to take action? Please?" Furthermore, this circuit's case law requires that the alleged discriminatory statement be more than just ambiguous to create an inference of animus. *Compare Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) ("[I]solated and ambiguous comments 'are too abstract, in addition to being irrelevant and prejudicial, to support a finding of . . . discrimination.'" (quoting *Gagné v. Nw. Nat'l. Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989))), *with Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 423, 431 (6th Cir. 2014) (finding a remark "indisputably retaliatory" where the discussion involved the plaintiff's filing of internal complaints and an EEOC claim). Threet's comments, however, fail to even indirectly suggest retaliatory animus. Accordingly, because Threet's email does not contain a discriminatory remark, the four-factor test under *Peters* need not be reached.

3.

The last relevant evidence that the district court relied on in denying Dow's Rule 50 motion was the testimony of Threet and Ingold about the possibility of holding an ERM during Hartman's FMLA leave. Specifically, Threet testified that while Hartman was on leave, he recommended that Ingold hold an ERM concerning Hartman, but Ingold told him that "the decision had been made that if an employee review meeting had been held for alleged timecard fraud while she was on leave, she might later file a lawsuit claiming that the action was because

- 14 -

she was on leave." However, when asked about that conversation, Ingold denied that it ever occurred, elaborating further that "[i]f there was going to be any sort of ERM or any other employee action, that's my job, not Toby's, and I certainly never heard or thought anything about that." Based on this testimony, the district court found that "the jury could have reasonably determined that Mr. Threet was credible" and that the testimony created "additional circumstantial evidence that Defendant's proffered reason for terminating Plaintiff was pretext."

Similar to Dow's objection to Threet's email, it contends that "even if the jury believed that Dow decided not to hold an ERM, it is not evidence of any desire to punish Hartman for taking FMLA leave." Instead, Dow maintains that Ingold's statement concerning not wanting to hold an ERM during Hartman's leave—if one presumes that Threet's recollection is correct—indicates that "Dow wanted to avoid even the appearance of taking any adverse action against Hartman while she was on leave." Further, Dow notes that it is not unlawful for an employer to consider whether an employee should be investigated for a violation of company policy, even if that employee is engaged in a protected activity.

Dow presents a compelling argument. To permit an inference of retaliatory animus based on a company's honest assessment of the potential risk of terminating an employee would unduly hinder frank employment decisions. Moreover, there must be a clear line for the purpose of liability between an employer considering whether an employee may file suit—even though the employer has a legitimate basis to take an adverse employment action—and an employer terminating a plaintiff based on the employee's protected status or engagement in a protected activity: the latter results in liability for the employer while the former does not. For that reason, it is legally insufficient for a jury to reasonably rely on Ingold's alleged statement that Dow was concerned that if an ERM was held concerning Hartman, she might file suit.

4.

Hartman contends that Ingold's "negative comments towards [her] and the suggestion that [she] was feigning her need for leave [is] further evidence of retaliation." Specifically, she notes that Ingold "had made fun of [her] need for medical leave to Ms. Bailey and the status of [her] recovery."

In an email from Connie Bailey to McKeon, Bailey wrote that Ingold had informed her that "after [Hartman] left . . . that he went to shake her hand[,] and she pretended like she couldn't do it." Ingold testified to the same, explaining that he thought Hartman's weak handshake "was [a] little staged."

This line of argument lacks merit. First, statements and actions by a decisionmaker "outside of the decisionmaking process" cannot be the sole basis for proving pretext. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 768 (6th Cir. 2015) (en banc) (citing *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)). Second, even assuming that Ingold was skeptical of Hartman's use of FMLA leave, "[n]othing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave." *Hall*, 529 F. App'x at 440 (quoting *Allen v. Butler Cty. Comm'rs*, 331 F. App'x 389, 395 (6th Cir. 2009)). In fact, just prior to meeting with Hartman, Ingold had received a report from Bailey that Hartman was engaging in activity inconsistent with her medical restrictions. Regardless of Ingold's skepticism, once Hartman provided a note from her doctor that indicated she needed more rehabilitation, Ingold was satisfied. Therefore, this incident fails to provide any evidence that retaliatory animus motivated Dow's termination of Hartman.

**V.**

"An appellate court does not set aside a jury verdict with ease,"—our standard of review reflects our reluctance to do so. *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 795 (6th Cir. 2005). Nevertheless, where a plaintiff's evidence of retaliatory animus ultimately rests solely on temporal proximity, a jury's verdict in favor of the plaintiff cannot stand. That is the case here. For that reason, we reverse the district court and remand for an entry of judgment in favor of Dow.

**REVERSED AND REMANDED.**