**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0582n.06

No. 12-4032

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jun 17, 2013
DEBORAH S. HUNT, Clerk

STELLA HALL,                                   )
                                               )
        Plaintiff-Appellant,                   )        ON APPEAL FROM THE
                                               )        UNITED STATES DISTRICT
v.                                             )        C O U R T   F O R   T H E
                                               )        NORTHERN DISTRICT OF
THE OHIO BELL TELEPHONE COMPANY,               )        OHIO
                                               )
        Defendant-Appellee.                    )        O P I N I O N

BEFORE:     BOGGS and COLE, Circuit Judges; and QUIST, District Judge.[*]

        **QUIST, District Judge.**

        Stella Hall appeals a district court's grant of summary judgment in favor of her former

employer, The Ohio Bell Telephone Company. Hall alleges that she was terminated from Ohio Bell

in retaliation for taking medical leave under the Family Medical Leave Act. For the following

reasons, we affirm the district court.

                                    **I. BACKGROUND**

        From 2001 to 2010, Hall worked for Ohio Bell as a customer service representative. Hall's

union had a collective bargaining agreement with Ohio Bell that provided for paid FMLA leave. In

August 2007, Hall had a "break down" on the sales floor during work. Shortly thereafter, Hall began

_____
        [*] The Honorable Gordon J. Quist, United States District Judge for the Western District of
Michigan, sitting by designation.

seeing a licensed clinical social worker who diagnosed Hall with an anxiety disorder and approved 80 hours of FMLA leave per month. Ohio Bell also approved the leave. Hall began taking FMLA leave on September 8, 2007.

While working for Ohio Bell, Hall wrote and self-published two novels. On October 11, 2007, the Cleveland *Call & Post* newspaper published an article about Hall titled, "STELLA, the hardest working author in Cleveland." In the article, Hall is quoted as saying that publishing a book "takes hard work, perseverance, and determination. All [are] factors in trying to make it out here. How far will you go? Meaning, are you ready to give up your Saturday or Friday or take off of work to make your dream come true?" In November 2007, Kimberly Miceli, the attendance manager of the Cleveland Ohio Bell call center, received a copy of the article. Miceli was responsible for reporting possible FMLA abuse to Ohio Bell's Asset Protection Department, which conducts investigations. On November 20, 2007, Miceli made a "Request for Investigation" of Hall's FMLA use. On the request form, Miceli cited as the "articulable suspicion of fraud" the article and the timing of Hall's book promotion and FMLA leave. However, Asset Protection did not conduct an investigation because Hall was also on overlapping intermittent disability leave, and company policy required the Disability Service Center to conduct such investigations.[1] Asset Protection informed Miceli that Miceli could forward the request to Hall's disability case manager for review. It does not appear from the record that Miceli pursued that option.

---

[1]Hall took overlapping disability leave on September 17, 2007, and November 8, 2007.

Beginning in 2008, Hall's work performance deteriorated. In February, Hall received a two-day suspension for violating the Ohio Bell/AT&T Code of Business Conduct for misuse of company time by remaining on a call for 52 minutes without a customer on the line. Hall's suspension letter stated that a future violation of the Code of Conduct "will result in disciplinary action up to and including dismissal." In September 2009, Ohio Bell placed Hall on a Performance Improvement Plan based on Hall's poor work performance. In October 2009, Hall received a "re-state" of a First Written Warning for "continued lack of consistency in overall performance." The letter stated, "[s]hould you fail to achieve improvement, you may be subject to further disciplinary action up to and including dismissal."

Hall also developed a pattern of taking FMLA leave. During 2008, Hall exhausted all 480 hours (12 weeks) of FMLA leave by mid-year but worked the remainder of the year with regular attendance. Beginning in early January 2009, Hall resumed taking FMLA leave. In March 2009, based on Hall's pattern of absence, Miceli again requested an investigation by Asset Protection, which observed Hall during her FMLA leave time. In August 2009, Asset Protection terminated the investigation without discovering evidence of FMLA abuse. During 2009, Hall again exhausted her FMLA hours by mid-year but worked the remainder of the year with regular attendance.

In January 2010, Hall resumed taking FMLA leave. Hall reported FMLA leave every Monday that she was supposed to work in early 2010. On or about February 12, 2010, Miceli requested an investigation of Hall on the basis of Hall's pattern of absence and Miceli's discovery, in a public work area, of a hotel reservation confirmation for four guests in the name of Hall's close

friend and colleague, Saniyyah Hughes, for a three-day weekend. Because Hall had taken FMLA leave every Monday, Miceli suspected Hall would take a trip with Hughes and Asset Protection would observe Hall at the hotel during FMLA leave. However, Hall did not take FMLA leave that Monday.

From January to July 2010, Hall worked on supervisor Shaun Smith's sales team. Hall alleges that at team meetings Smith would direct toward Hall comments about FMLA-related attendance patterns. Under Smith, Hall received poor evaluations, which Hall attributes to Smith's "nitpick[ing]" of Hall's performance. On February 26, 2010, Hall complained to employee relations manager Lee Jones that Smith was harassing her for taking FMLA leave. Hall alleged that Smith made statements such as, "if you continue to show a pattern, we will do something about it" and "if I seem to that [sic] I am picking on you, my mother died and I came to work the next day." Hall also alleged that when she called to report FMLA leave, sometimes Smith would make statements about her absences. Hall asked Jones to remove her from Smith's team. Hall also explicitly requested that her complaint remain anonymous. As a result, Jones did not inform Smith that Hall had complained about FMLA-related harassment. However, Jones did approach Smith's supervisor, Freeze McCarter, about Smith's behavior without mentioning Hall by name. McCarter confirmed that he was present at the team coaching session at which Smith made comments related to FMLA leave. McCarter told Jones that Smith's comments could have been more sensitive and he would work with Smith to improve his coaching. McCarter, however, did not express any concern that the comments constituted harassment or were directed at any particular employee. Jones did not further investigate,

but he kept a record of Hall's harassment complaint and, on March 24, 2010, noted: "Closed investigation as the employee Stella Hall did not want any one in the office to know that she reported this claim."

Hall was on Smith's sales team for approximately six months before she was transferred to Tiffany Ferrell's team on July 1, 2010. On or about July 23, 2010, Hall received a First Written Warning for lack of consistency in overall performance, based in part on her performance under Smith. Hall does not allege that Ferrell harassed Hall about her FMLA leave.

On August 26, 2010, Hall's nine-year-old step-grandchild, Aria Smith, died. Aria was the daughter of Hall's step-child, Domain Hall. On August 30, 2010, Hall informed Miceli that her "grandchild" had died and presented Miceli with a letter from E.F. Boyd funeral home identifying Aria as Hall's "grandchild." Hall asked how much funeral leave she could receive. Miceli thought it was unusual that Hall had arrived with a letter from the funeral home because usually employees obtained a letter after an initial meeting or after the funeral, not in anticipation. Miceli read the pertinent section of the collective bargaining agreement aloud to Hall:

> 18.05 Employees absent due to death of a child, step-child, spouse or Registered Domestic Partner, parent or any relative listed in 18.06 or 18.07 who resides in the same house with the employee will be excused from duty without loss of pay for up to a maximum of three (3) work days (including travel time) beginning with the day of death through the day of the funeral. In addition, in the event of a death as noted herein, employees shall upon request be excused from scheduled time for two (2) additional unpaid days. Paid Vacation Days or Excused Work Days may be substituted for these days at the employee's option.

> 18.06 Except as provided for in paragraph 18.05, employees absent due to the death of a step-parent, brother, sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, grandparent or grandchild will be excused from duty without

loss of pay for up to a maximum of two (2) work days (including travel time) beginning with the day of death through the day of the funeral. In addition, in the event of a death as noted herein, employees shall upon request be excused from scheduled time for two (2) additional unpaid days. Paid Vacation Days or Excused Work Days may be substituted for these days at the employee's option.

18.07   Except as provided for in paragraph 18.05[,] employees absent due to the death of a brother-in-law, sister-in-law or spouse's grandparent will be excused from duty without loss of pay for up to one (1) work day (including travel time) beginning with the day of death through the day of the funeral.

Miceli confirmed with Hall that Hall meant "grandchild," but the record is unclear whether Miceli asked Hall that question before or after reading the language of the agreement to Hall.

Around the same time, Hall informed her supervisor, Ferrell, that Hall had learned of Aria's death on Facebook. They discussed the upcoming funeral. Ferrell found it "odd" that Hall "showed no remorse in discussing the death." Ferrell offered to post funeral service information on the company notification board, but, in Ferrell's words, Hall "refused." Ferrell also tried to obtain information about the funeral service so that she could attend,[2] however, Hall responded with confusing text messages. The first text message from Hall to Ferrell provided an address, but the second text message said, "2nite @ 8pm 3 lutheran and putius @ not 3." Confused about the message's meaning, Ferrell called E.F. Boyd funeral home, and was told that there was no record of Aria Smith.

---

[2]Ferrell testified that it was common for team members at Ohio Bell to attend the funerals of co-workers' family members and Ferrell had attended several funerals. Additionally, she testified that it was standard practice to post funeral service information on a hallway notification board.

As permitted by the collective bargaining agreement for individuals seeking funeral leave for the death of a biological grandchild, Hall took two paid and two excused, unpaid days of leave. On September 3, 2010, while Hall was on funeral leave, Ferrell and Miceli saw Hall at work. Hall stated that she had come to pick up her paycheck. After Ferrell reported her concerns that Hall had committed funeral leave fraud, on September 10, 2010, Miceli submitted an investigation request to Asset Protection. Miceli used a standard "FMLA/STD/WC - Request for Investigation" form, the same form she had used to place investigation requests related to Hall's FMLA leave. One line on the form states "Number of FMLA Hours Remaining," next to which Miceli wrote "1.75 hrs." Ron Williams, lead asset protection analyst, conducted an investigation.

On September 16, 2010, Hall received a Final Written Warning for taking two unauthorized breaks during a shift. The warning stated that "[a]ny further chargeable absences, tardies, or chargeable disabilities could lead to more serious corrective action, up to and including, termination of your employment."

On September 23, 2010, Williams contacted E.F. Boyd funeral home, which has multiple locations, and confirmed that there was an Aria Smith in the funeral home's records, although the funeral home had no additional information because the family ultimately made its own funeral arrangements. Williams could not find any obituaries for Aria. On September 28, 2010, Williams contacted the Cuyahoga coroner's office, which could not confirm Aria's death.

On September 30, 2010, Williams interviewed Hall about her funeral leave in the presence of Ferrell and two union representatives. After the interview, Williams began to prepare Hall's written statement pursuant to company policy. However, approximately 15 minutes later, Williams

decided that he had some additional questions, so he asked Hall and the union representatives to return to the conference room. Ferrell was not present. Williams asked Hall if Aria's mother, Domain Hall, was Hall's biological daughter. Hall declined to answer, and a union representative asked for a recess. When they returned to the conference room, Williams repeated the question and Hall stated that Domain Hall was not her biological daughter.

The same day, Hall's supervisors issued Hall a suspension letter stating, "[b]ased on a department and AT&T Asset Protection Investigation, we have determined that you have demonstrated behavior that may be deemed a Code of Business Conduct Violation. . . . [Y]ou are now being Suspended Pending Investigation[.]" Williams continued his investigation. On October 13, 2010, he obtained a death certificate for Aria from Cleveland City Hall, stating that Aria had died on August 26, 2010. Later that day, Williams completed his investigation by issuing an investigation report and provided the report to General Manager Scott Willis. Hall received a review board hearing. After the hearing, Willis reviewed Williams's investigation report and Miceli's request for investigation and concluded that Hall had "intentionally engaged in fraud." Ohio Bell terminated Hall on November 9, 2010.

## II. DISCUSSION

### A.    Standard of Review

This court reviews a district court's grant of summary judgment de novo. *Chapman v. United Auto Workers Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Bobo*

8

*v. United Parcel Serv., Inc.*, 665 F.3d 741, 748 (6th Cir. 2012). The burden to show that there is no genuine issue of material fact falls upon the party seeking summary judgment. *Id.* In evaluating the evidence, we must draw all reasonable inferences in favor of the non-moving party. *Donald v. Sybra, Inc.*, 667 F.3d 757, 760 (6th Cir. 2012). To survive a summary judgment motion, the non-moving party must present sufficient evidence for a reasonable jury to find for the non-moving party. *Id.*

**B.      Pretext**

To establish a prima facie case of FMLA retaliation, a plaintiff must establish that: (1) she engaged in an activity protected by the FMLA; (2) her employer knew that she was exercising her FMLA rights; (3) her employer took an adverse employment action; and (4) there was a causal connection between her protected FMLA activity and the adverse action. *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). Once a plaintiff has established a prima facie case, the burden shifts to the employer to present a legitimate, non-retaliatory reason for terminating the plaintiff. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 284 (6th Cir. 2012). If the employer succeeds, the burden shifts back to the plaintiff to show that the employer's proffered reason was a pretext for unlawful discrimination. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). "Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* (internal quotation marks, citations, and alterations omitted). To establish pretext, a plaintiff is required to show by a preponderance of the evidence that: (1) the proffered reason had no basis in fact, (2) the reason did not actually motivate the plaintiff's discharge, or (3) the reason was

insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

**1.      Actual Motivation for Termination**

**a.      Temporal Proximity and Heightened Scrutiny**

Hall first argues that the temporal proximity between her first FMLA leave request and Ohio Bell's first investigation, combined with Ohio Bell's "heightened scrutiny" of Hall, is sufficient evidence of pretext.

"Unlike its role in establishing a prima facie case, 'the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.'" *Seeger*, 681 F.3d at 285 (quoting *Donald*, 667 F.3d at 763). However, "'suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence.'" *Id.* (quoting *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009)). Courts measure temporal proximity from the time an employer learns of a protected activity to the time of the adverse employment action. *See, e.g.*, *Cecil v. Louisville Water Co.*, 301 F. App'x 490, 502 (6th Cir. 2008).

Hall argues that the two months between Hall's first FMLA leave request and Ohio Bell's first investigation of Hall is evidence of pretext, at least in combination with Ohio Bell's scrutiny of Hall. The basis of Hall's "heightened scrutiny" argument is that Ohio Bell twice investigated Hall for FMLA fraud and that Smith allegedly harassed Hall for taking FMLA leave.[3]

---

[3]Ohio Bell argues that Hall failed to raise the issue of heightened scrutiny before the district court and is therefore precluded from raising it on appeal. However, we need not decide the issue because, even if Hall had raised the issue, Hall's argument would still fail as a matter of law.

"'Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave.'" *Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 395 (6th Cir. 2009) (emphasis omitted) (quoting *Callison v. City of Philadelphia*, 430 F.3d 117, 121 (3d Cir. 2005)); *see also Stonum v. U.S. Airways, Inc.*, 83 F. Supp. 2d 894, 901 (S.D. Ohio 1999) (requiring a defendant to articulate "'particularized facts' to support its *termination* decision, not its decision to conduct surveillance" (emphasis in original)). However, "when an 'employer . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee,' the employer's actions constitute 'the very definition of pretext.'" *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009) (quoting *Jones v. Potter*, 488 F.3d 397, 408 (6th Cir. 2007)). The burden is on the plaintiff to introduce evidence which tends to prove that "an illegal motivation was *more* likely than that offered by the defendant." *Manzer*, 29 F.3d at 1084.

In this case, Ohio Bell has articulated particularized facts to support its investigations into Hall's FMLA leave. Ohio Bell maintained contemporaneous records of its reasons for investigation. Although it was only two months after Hall began taking FMLA leave, Miceli's first investigation request was a direct result of a newspaper article about Hall suggesting that Hall may have taken paid FMLA leave to write her book. In 2009, Miceli again requested an FMLA fraud investigation because she observed that Hall had exhausted her FMLA leave by mid-2008, worked the remainder of the year with regular attendance, and resumed taking frequent FMLA leave starting at the beginning of 2009. Hall's pattern of absence continued and, in 2010, she reported FMLA leave every Monday that she was scheduled to work. Therefore, when Miceli learned of a hotel reservation

for a three-day weekend by Hall's close friend and coworker, Miceli was reasonable to suspect that

Hall might report FMLA leave that Monday while actually staying at the hotel with her friend. At

every turn, Ohio Bell articulated a legitimate, non-discriminatory reason for investigation.

Hall also argues that Smith's alleged harassment of Hall for taking FMLA leave is evidence

of heightened scrutiny. However, there is no evidence that Smith was involved in Hall's

investigation or termination for funeral leave fraud. By the time Hall was investigated for a funeral

leave violation, Hall had not worked for Smith for several months.[4]

Taken together, the temporal proximity and alleged heightened scrutiny are insufficient

evidence of pretext. First, the better measurement of temporal proximity is three years—the time

between Hall's first FMLA request and her termination—because the earlier FMLA investigations

did not result in any adverse employment action. Second, the record does not support that Ohio Bell

targeted Hall for investigation merely because she took FMLA leave. Rather, Ohio Bell has

presented evidence that it investigated Hall in good faith based on evidence suggesting that she

might have been abusing paid FMLA leave. Finally, Smith's alleged harassment of Hall is not

evidence of pretext because Smith was not involved in the decision to terminate Hall. Thus, even

in combination, the temporal proximity and alleged heightened scrutiny are insufficient to

demonstrate that "an illegal motivation was *more* likely than that offered by the defendant." *Id.*

---

[4]Hall also argues that Ohio Bell's failure to investigate Hall's harassment complaint against
Smith is evidence of heightened scrutiny. However, Hall's argument is not supported by the factual
record. First, Hall requested that she remain anonymous, so Hall cannot now argue that Jones should
have confronted Smith about harassing Hall. Second, the record shows that Jones did investigate
Hall's complaint by contacting Smith's direct supervisor, McCarter. Once Jones received a
satisfactory response, Jones closed the complaint.

###### b.    Discriminatory Compensation Policy

Hall argues that Ohio Bell's compensation policy is evidence of pretext because it encourages supervisors to "selectively punish" FMLA users.  Hall alleges that Ohio Bell lowers sales representatives' sales goals proportionately with their FMLA use, but does not lower team leaders' sales goals.  Hall argues that this policy decreases the likelihood that an FMLA user's team leader will meet his sales goals and encourages FMLA-based discrimination.

The factual record does not support Hall's argument.  As the district court found, the record is unclear as to whether leaders are penalized for the lack of sales by employees on FMLA leave.  All pertinent evidence comes from Smith's deposition.  Smith first testified that leaders are *not* held accountable for sales during "protected [FMLA] time."  However, Smith also testified that a leader's gross sales can be affected by an employee "who's taken extensive amounts of leave."  Nonetheless, Smith stated that even if a leader is affected by loss of sales due to leave, employees taking FMLA leave are spread among the sales teams, so FMLA leave does not disadvantage any one team.  Moreover, Smith stated that even when employees take extensive FMLA leave, Smith is able to exceed his sales goals, so FMLA leave does not present a problem.  Thus, the record does not support Hall's argument that Ohio Bell's compensation system encourages leaders to selectively punish FMLA users. Moreover, there is no evidence that the allegedly unfavorable policy influenced Willis's decision to terminate Hall.

###### 2.    Insufficient Basis for Termination

Finally, Hall argues that Ohio Bell's proffered reason for termination was an insufficient basis for termination because Ohio Bell had never terminated an employee for funeral leave fraud

and because Ohio Bell knew Hall sought funeral leave for a step-grandchild but did not terminate her until it realized it could not prove its theory that Hall fabricated Aria's death.

An argument for insufficient basis "'ordinarily . . . consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.'" *Jones*, 488 F.3d at 407 (quoting *Manzer*, 29 F.3d at 1084). "[T]o be deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Again, the record evidence does not support Hall's argument.[5] First, Hall's theory that Ohio Bell knew that Hall did not have a nine-year-old biological granddaughter is based on the fact that Hall was only 41 years old and that Hall had worked at Ohio Bell since 2001, so that her supervisors were generally aware of the ages of her biological children. However, there is no evidence in the record that anyone at Ohio Bell knew that Aria was not Hall's biological grandchild. It is unclear whether Hall or Ferrell communicated to Miceli or Williams that Aria was nine years old. Second, Hall's theory is premised on the fact that Williams continued to investigate Hall's funeral leave after the September 30, 2010 interview at which Hall admitted Aria was not her biological grandchild.

---

[5]The parties do not dispute that Ohio Bell had not previously terminated an employee for funeral leave fraud.

The record, however, shows that as soon as Ohio Bell learned that Aria was not Hall's biological grandchild, it issued Hall a notice of suspension pending investigation. Williams received information from the funeral home on September 23, 2010 that the name Aria Smith was in their records and continued his investigation until he had received confirmation of Aria's death from Cleveland City Hall on October 13, 2010. Hall, however, has not offered evidence to support her argument that the investigation was a departure from Ohio Bell's normal practice, and the law does not require that an investigation be conducted perfectly. *See Carson v. Ford Motor Co.*, 413 F. App'x 820, 823–24 (6th Cir. 2011) (rejecting a plaintiff's argument that the procedural inadequacies of an investigation were sufficient evidence of pretext); *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

Hall has also failed to present evidence of any similarly situated employee who was not fired for a similar funeral leave violation.[6] *See Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (observing that the "ultimate . . . question" is whether there is "an allegation that other employees involved in acts . . . of *comparable seriousness* . . . were nevertheless retained" (internal quotation

---

[6]Hall also argues that Ohio Bell's failure to discipline Smith, Jones, McCarter, and Ferrell for Code of Conduct violations is evidence that funeral leave was an insufficient basis for termination. The alleged violations by Smith, Jones, and McCarter for failure to investigate Hall's harassment complaint are addressed in footnote 4 *supra*. Regarding Ferrell, Hall also alleges, and Ohio Bell does not deny, that Ferrell lied about the existence of an investigation into Hall's funeral leave. Nonetheless, because Ferrell was not similarly situated to Hall and did not engage in similar conduct—Ferrell did not intentionally receive pay to which she was not entitled—Ferrell's violation is not evidence that funeral leave fraud was an insufficient basis for termination.

marks omitted)). Thus, for purposes of her insufficient basis argument, Hall has created a genuine issue of material fact that a funeral leave violation was insufficient grounds for termination.

Finally, Ohio Bell has articulated particularized facts to support an honest belief that Hall engaged in intentional funeral leave fraud. For a proffered reason to be legitimate, a defendant must have had an honest belief in the reason for the termination. *Seeger*, 681 F.3d at 285–86. "'[A]n employer's proffered reason is considered honestly held where the employer can establish it reasonably reli[ed] on particularized facts that were before it at the time the decision was made.'" *Id.* at 285 (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)). "In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Chrysler Corp.*, 155 F.3d at 807.

Ohio Bell's proffered reason for Hall's termination is that Hall intentionally violated the funeral leave policy. Hall denies that the violation was intentional. Before terminating Hall, General Manager Willis read Miceli's request for an investigation and Williams's investigation report. Willis concluded that Hall intentionally violated the funeral leave policy on the basis of the following facts: Hall (1) learned of the death on Facebook, (2) sent her sales coach a text message that did not make sense when her coach attempted to attend the funeral, (3) showed up at the call center on a funeral leave day to pick up her paycheck, (4) discussed the funeral leave requirements with Miceli prior to taking funeral leave, (5) told Miceli that her "granddaughter" died instead of disclosing that it was

16

her step-granddaughter, and (6) initially refused to answer whether Aria's mother was Hall's biological daughter. According to Willis, Ohio Bell "almost always discharges" an employee who intentionally receives pay to which she is not entitled, including those who commit FMLA leave fraud and funeral fraud. Willis had the authority to offer Hall a "return to work letter" but declined to do so because Hall "did not have a long-term history without performance issues and discipline that would have led [him] to consider making an exception to the usual decision to terminate." Therefore, even if Hall did not intentionally violate the funeral leave policy, and even if Williams's investigation was imperfect, Ohio Bell has articulated particularized facts upon which it could have reasonably relied to form an honest belief that Hall had intentionally violated the funeral policy.[7]

### III. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of Ohio Bell is **AFFIRMED**.

---

[7]Because Hall has failed to satisfy her burden of showing that Ohio Bell's proffered reason for Hall's termination was a pretext for retaliation, we need not decide whether the district court erred in finding that Hall had a serious health condition entitling her to FMLA leave.